UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARK HAYNIE,

                    Plaintiff,

       v.                                    Case No. 17-cv-853-pp

DR. KAREN BUTLER,
DR. ABDUL DURRANI,
and REBECCA S. SWENSON,

                    Defendants.

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 57, 64, 71) AND DISMISSING CASE**

Plaintiff Mark Haynie is a federal prisoner representing himself. He alleges that the defendants denied him proper medical care when he was confined at the Kenosha County Detention Center, in violation of his constitutional rights. The three defendants, who are represented by different lawyers, have filed motions for summary judgment. Dkt. Nos. 57, 64, 71. The court grants the defendants' motions and dismisses the case.

## I.      Procedural Background

The plaintiff filed a complaint alleging that then-unknown defendants violated his constitutional rights when he was confined at the Kenosha County Detention Center (KCDC). Dkt. No. 1. Magistrate Judge David E. Jones screened the complaint under 28 U.S.C. §1915A and determined that the plaintiff had stated a claim for deliberate indifference to a serious medical need under the Eighth Amendment, based on allegations that KCDC staff denied

1

him his medically necessary prescription medication and failed to monitor his high blood pressure/hypertension condition, resulting in harm. Dkt. No. 18 at 5. Judge Jones allowed the plaintiff to conduct limited discovery to learn the names of the individual involved in the alleged violation. Id. at 6. He gave the plaintiff a deadline by which to file an amended complaint, identifying the defendants involved. Id. at 7.

The plaintiff filed his amended complaint on March 2, 2018, naming Dr. Karen Butler, Nurse Rebecca Swenson and Dr. Abdul Durrani as defendants. Dkt. No. 32. Judge Jones screened the amended complaint and determined that the plaintiff could proceed on deliberate indifference claims against (1) Butler and Swenson because they allegedly refused to provide the plaintiff his necessary medication for twenty months and failed to monitor him, resulting in harm, and (2) Durrani and Swenson because they allegedly prescribed the plaintiff the wrong medication, which complicated his medical condition. Dkt. No. 34 at 1-2.

On April 24, 2018, the clerk's office reassigned the case to this court because at least one of the parties had not consented to the magistrate judge's authority to decide the case.

## II. Facts[1]

The plaintiff was confined at KCDC from May 12, 2015 to April 3 or 4, 2017. Dkt. Nos. 76 at ¶1; 66 at ¶1; 104 at ¶1; 102 at ¶1; 99 at ¶1. During this period, defendant Swenson was a licensed nurse practitioner working at KCDC in that capacity. Dkt. Nos. 76 at ¶2; 104 at ¶2. Defendant Butler was a physician at KCDC when the plaintiff arrived there. Dkt. Nos. 66 at ¶2; 102 at ¶2. Defendant Durrani worked at KCDC during the relevant period.[2] Dkt. No. 99 at ¶4.

### A. May 12, 2015 through January 11, 2017

When the plaintiff arrived at KCDC on May 12, 2015, a medical screening questionnaire reported that he took "high blood pressure meds." Dkt. Nos. 76 at ¶4; 104 at ¶3. The plaintiff reported on some medical forms that previously he had been treated for hypertension. Dkt. No. 66 at ¶4. The plaintiff did not have any medications with him when he arrived at KCDC. Id. at ¶5. The plaintiff states that he did not bring his medication "when he was arrested at home but a Prisoner Custody Alert Notice was prepared by the U.S. Marshal." Dkt. No. 102 at ¶5.

---

[1] For the most part, the court has taken the facts from the defendants Proposed Findings of Fact, dkt. nos. 59, 66, 76, and the defendants' responses to the plaintiff's three proposed findings of fact filed in response to the defendants' summary judgment motions, dkt. nos. 99, 102, 104. The court has included only relevant, material facts that comply with Fed. R. Civ. P. 56(c) and Civil Local Rules 56(b)(1)(C) and (b)(2)(B) (E.D. Wis.).

[2] Durrani refers to himself in his brief and other pleadings as "Dr. Durrani." See, e.g., Dkt. No. 60. He does not explain whether he was employed by KCDC, or worked there as a contract physician, or had some other relationship with KDCD.

The day after the plaintiff arrived at KCDC, Dr. Butler ordered that his blood pressure and arterial pressure be monitored for three days, and that she be notified if his blood pressure exceeded 140/90 and/or if his arterial pressure was not between 60 and 100. Dkt. No. 66 at ¶7. On May 13, 2015, the plaintiff's blood pressure was 120/84, and his pulse was 98; on May 14, 2015, the plaintiff's blood pressure was 124/86, and his pulse was 97; and on May 16, 2015, his blood pressure was 132/82, and his pulse was 97. Dkt. No. 76 at ¶6.

On May 16, 2015, Butler ordered the nurses to recheck the plaintiff's vital signs within two days, and to call if the results did not fall within the stated parameters. Dkt. Nos. 76 at ¶7; 66 at ¶10. On May 18, 2015, a nurse documented that the plaintiff's blood pressure was 118/84, with a pulse of 87. Dkt. No. 76 at ¶8.

On May 18, 2015, Nurse Swenson ordered a re-check of the plaintiff's blood pressure and pulse in one month. Dkt. No. 76 at ¶13. Butler co-signed this order. Dkt. No. 66 at ¶12. One month later, on June 18, 2015, the plaintiff's blood pressure was 122/86, and his pulse was 90, which are normal results. Dkt. Nos. 76 at ¶13; 66 at ¶13.

The plaintiff's medical records indicate that his blood pressure was checked during a correctional physical exam on May 20, 2015. Dkt. No. 66 at ¶14. Medical notes from the exam indicate that his blood pressure was 124/90, a normal result, and that his "B/P is being monitored." Id. at ¶15.

A normal medical standard to determine the presence of hypertension (high blood pressure) is 140/90. Dkt. No. 76 at ¶14. If a patient's blood pressure exceeds 140/90, he is considered for use of hypertensive medication. Id. The plaintiff's blood pressure was checked and rechecked and did not indicate the need for ordering hypertensive medication. Id. Based on Swenson's medical training and experience, she believed that it was not medically necessary to order hypertension medications for the plaintiff based on his condition and blood pressure. Id.

Given the normal blood pressure readings between May 13 and June 18, 2015, Butler did not believe that medication for high blood pressure was medically indicated. Dkt. No. 66 at ¶16. If the plaintiff was suffering from hypertension and needed medication for it, his blood pressure would have demonstrated that need by June 2015. Id. at ¶17. Giving medications when they are not needed can cause harm. Id. at ¶18. Butler did not have any further contact with the plaintiff, and she did not see any requests from the plaintiff for medical attention in 2015 or 2016. Id. at ¶19. Butler stopped working at KCDC on April 15, 2016. Id. at ¶22.

The plaintiff's medical records show no further activity regarding his blood pressure from June 18, 2015 until early January 2017. Dkt. No. 76 at ¶15. He did not file any Inmate/Detainee Medical Request forms (HSRs), which an inmate fills out to request medical attention. Id.

According to the plaintiff, Swenson's initial excuse for not supplying him hypertension medication was that it was very expensive and that KCDC could

not afford to supply him with the medication because his blood pressure was normal. Dkt. No. 104 at ¶6. Swenson disputes this. Id.

B.    January 12, 2017 through April 3 or 4, 2017

On January 12, 2017, at his yearly physical, the plaintiff had a blood pressure of 170/120. Dkt. No. 76 at ¶16. That day, Swenson ordered for the plaintiff:

> Clonidine 0.2 mg by mouth now, then Clonidine 0.2 mg by mouth 2 x a day until medications arrive, then discontinue.
> Lisinopril 20 mg daily x 365 days.
> HCTZ (Hydrochlorothiazide) 25 mg by mouth daily x 365 days.
> Metoprolol 25 mg 2 x a day x 365 days.
> Blood pressure and applicable pulse daily until blood pressure is below 140/90.

Id. at ¶17. She also ordered laboratory tests in two to three weeks—sooner if possible. Id. at ¶18. That same day, a nurse entered into the Progress Notes: "Blood pressure and pulse reported to R Swenson, APNP. Blood pressure 163/123, heart rate 95, see new Order." An order for blood pressure/pulse check twice daily was issued for January 12 through January 15, 2017. Id. at ¶19. A re-check that day showed a blood pressure of 114/78, with a pulse of 71. Id. On January 13, 2017, a nurse recorded the plaintiff's blood pressure of 144/88, with a pulse of 75. Id.

On January 13, 2017, Swenson ordered the plaintiff's blood pressure and pulse to be checked three times, and to report any abnormal results. Dkt. No. 76 at ¶21. On January 14, 2017, the plaintiff's blood pressure was 132/92, with a pulse of 70; on January 15, 2017 the plaintiff's blood pressure was

146/92, with a pulse of 70; and on January 16, 2017, the plaintiff's blood

pressure was 180/120, with a pulse of 65. Id. at ¶22.

On January 16, 2017, a nurse entered the following Progress Note:

"Blood pressure/pulse re-checked in patient's left arm using electronic cuff.

Blood pressure equals 197/127, with a pulse of 72. Rebecca Nurse Practitioner

notified. See new Orders." Dkt. No. 76 at ¶23. That same day, Swenson

ordered:

> Clonidine 0.2 mg by mouth x 1 dose now.
> Re-check blood pressure/pulse in (two) 2 hours using electronic cuff.
> Increase Lisinopril to 40 mg by mouth daily.
> Spironolactone 25 mg by mouth daily.
> Re-check blood pressure/applicable pulse daily x seven (7) days using electronic cuff only; call United States Marshal to get stat labs approval.

Id. at ¶24. Following Swenson's order to re-check the plaintiff's blood pressure

and pulse in two hours, a nurse recorded that the plaintiff's blood pressure

was 111/73, and his pulse was 72, which are normal findings. Id. at ¶25.

On January 17, 2017, the plaintiff's blood pressure was 148/103, with a

pulse of 68; on January 18, 2017, his blood pressure was 131/92, with a pulse

of 91; on January 19, 2017, the plaintiff's blood pressure was 154/104, with a

pulse of 71; and on January 20, 2017, it was 161/104, with a pulse of 85. Dkt.

No. 76 at ¶27.

On January 17, 2017 the U.S. Marshals Service approved laboratory

testing for the plaintiff and the lab test blood draw was performed that day.

Dkt. No. 76 at ¶28. The next day, Swenson entered a Progress Note stating

"reviewed labs. No new Orders." Id. at ¶30.

On January 21, 2017, the plaintiff prepared an HSR stating: "I'm trying to find out the results of my blood work that was done on me." Dkt. No. 76 at ¶31. A nurse responded that day: "the Nurse Practitioner reviewed your lab results and no new orders were given." Id. The nurses documented the following finding as to the plaintiff: "January 22, 2017, blood pressure 170/109, with a pulse of 75 before taking Clonidine." Id. at ¶32. On January 23, 2017, the plaintiff's blood pressure was 118/87, with a pulse of 64, and on January 24, 2017, his blood pressure 192/73, with a pulse of 64. Id.

On January 23, 2017, Swenson entered a new Progress Note, stating: "received blood pressure results; discontinue Clonidine 0.1 mg daily." Dkt. No. 76 at ¶33. Two days later, Swenson ordered:

> Change Lisinopril to 30 mg by mouth daily x 1 year.
> Change Metoprolol to 12.5 mg by mouth twice a day x 1 year.
> Clonidine 0.1 mg by mouth daily x 1 year.
> Blood pressure/pulse checks daily using electronic cuff until less than 140/90.

Id. ¶34.

On February 4, 2017, the plaintiff prepared an HSR stating "I'm starting to feel some side effects from this medication that I'm taking. My chest is feeling strange and my head be light at times." Dkt. No. 76 at ¶35. The next day, a nurse entered a Progress Note stating:

> Blood pressure/face to face: patient's blood pressure and apical pulse obtained per patient's request 122/72, pulse 72. Patient asked about med slip. Patient reports he doesn't need to be seen for sick call, wanted blood pressure taken. ROR (Release of Responsibility) to be signed. Patient encouraged to notify HSU if he needs to be seen.

Id. That same day, the plaintiff signed a Release of Responsibility form stating: "I hereby refuse to accept the following treatment/recommendations: sick call, complaint of side effects from meds. Reason for refusal: had blood pressure check." Id. The form lists as education provided, "change position slowly/stay well hydrated/notify HSU if symptoms continue or worsen." Id. That day, nursing staff entered into the plaintiff's record, "blood pressure and pulse one time per patient request showing blood pressure of 122/82, and a pulse of 70." Id. at ¶36.

On February 9, 2017, Swenson ordered: "decrease Clonidine to 0.1 mg by mouth every other day x 1 week, then stop. Blood pressure/pulse in one week." Dkt. No. 76 at ¶37. That same day, Swenson prepared a six-page document entitled "Chronic Disease Clinic Initial Baseline Medical Data," which outlined a summary of the plaintiff's condition and plan for treatment of hypertension. Id. at ¶38. The plaintiff's blood pressure and pulse were 104/80 and 65. Id. Swenson documented under Chief Complaint:

> "No complaints today." I ordered a decrease in Clonidine to 0.1 mg by mouth every other day for 1 week, then stop. I ordered BP/AP in 1 week and report to Nurse Practitioner.

Id. Swenson also discussed with the plaintiff potential use of statin medications. Id.

On February 12, 2017, the plaintiff prepared an HSR stating: "I'm requesting to know the names of all of the medications that I'm taking and what each one is for?" Dkt. No. 76 at ¶39. The HSU responded as follows:

1. Hydrochlorothiazide 25 mg daily
2. Lisinopril 30 mg daily

      3. Metoprolol Tart 25 mg twice daily
      4. Spironolactone 25 mg
      All are to control your blood pressure.

Id. at ¶39.

On March 2, 2017, the plaintiff prepared an HSR stating, "I'm requesting to have my blood pressure checked." Dkt. No. 76 at ¶40. The nursing response was: "seen face to face 3-3-17." Id. On March 3, 2017, a nurse recorded in Progress Notes: "Blood pressure/apical pulse checked per patient request. Blood pressure equals 130/78, pulse 69. Patient had no complaints. Patient instructed to notify HSU of any changes." Id.

At his yearly physical examination on January 12, 2017, the plaintiff had an elevated blood pressure; Swenson treated him with well-recognized medications for the treatment of high blood pressure and titrated the medications and dosages until the plaintiff's blood pressure was again within normal parameters. Id. at ¶41. Swenson believes that her treatment of the plaintiff's blood pressure was well within acceptable medical practice and within requisite standards of medical care. Id.

The medical administration record, with Dr. Durrani noted as the physician, shows the plaintiff was administered Clonidine, Lisinopril, Metoprolol, Spironolactone, and Hydrochlorothiazide in January 2017. Dkt. No. 59 at ¶15. The same record, again with Durrani noted as the physician, shows that the plaintiff was administered Clonidine, Lisinopril, and Metoprolol in February 2017. Id. at ¶16. According to the Physician's Desk Reference,

Metoprolol, Spironolactone, and Clonidine can be used to treat hypertension. Id. at ¶¶18-20.

The plaintiff says that even though he alerted KCDC staff at intake that he was taking high blood pressure medication and was "under care of Des Plaines Valley Medical Center," dkt. no. 97 at ¶4, he wasn't "seen or re evaluated for 20 months and didn't receive a yearly physical which is policy + required by law." Id. at ¶5. He states that he made "numerous medical request[s]" to Butler and Swenson "concerning blood checks, what medication [he] was taking." Id. at ¶7. The plaintiff says the reason he complained about the side effects of the medication—his chest feeling strange and feeling light-headed—was because of the twenty-month delay in treating him and being given the "wrong" medication. Id. at ¶8. He asserts that he was prescribed Hydrochlorothiazide and Lisinopril by doctors at F.C.I. Terre Haute (he does not say when) and says that he had taken those medications "for the past 10 years with no complication until arrival at [KCDC]." Dkt. No. 96 at ¶6. He avers that Durrani prescribed him the "wrong medications: Metroprolol, Spionolactone, and Clonidine . . . ." Id. He also says that Durrani did not give him the right medications—the Hydrocholorothiazide and Lisinopril—until "20 months later." Id. The plaintiff says that Durrani also was deliberately indifferent to the plaintiff's serious medical need when Durrani "didn't admit [him] to an outside hospital when [his] blood pressure wouldn't go down from 192/140." Id. at ¶11. He contends that Durrani and Swenson "deliberately" supplied him with Metoprolol, Spironolactone and Clonidine "after his high

blood pressure was abnormally over 140/190, when if they only supplied Hydrochlorothiazide and Lisinopril as medical records indicated he would not have had the negative health issues." Id. at ¶7.

As for Butler, the plaintiff says that while she and the nursing staff checked his pressure when he arrived, he wasn't seen or re-evaluated for 20 months and didn't receive the required annual physical. Dkt. No. 92 at ¶6. He states that Butler ignored his medical needs, even though she'd been advised that he was on blood pressure medication and despite the alert notice from the Marshal. Id. at ¶7. The plaintiff asserts that Butler told him that he was "fine without [his] medication," and that he didn't have any reason to put in medical requests until he discovered that his hypertension was "out of control" as a result of Butler's "decision not to prescribe [his] legal hypertension medication in hopes to save [KCDC] money." Id. at ¶10.

As for the impact of the defendants' actions on his health, the plaintiff says that he has "suffered heart, arteriole and cardiovascular system damage which prevent him from his normal daily activity." Dkt. No. 96 at ¶8.

C.    Exhaustion of Administrative Remedies

The plaintiff admits that he was aware of the KCDC grievance process. Dkt. No. 92 at ¶13. The grievance policy required inmates to file a grievance within five days of the underlying occurrence. Dkt. No. 66 at ¶28.

According to the defendants, the plaintiff availed himself of the grievance procedure on only two occasions while at KCDC and neither grievance involved a complaint about his medication management nor about any health concerns.

12

Dkt. No. 66 at ¶¶29-30. According to the plaintiff, he filed three grievances regarding his medication management and health conditions to while at KCDC, and he filed one when he was at MCC Chicago, but he never received a response. Dkt. No. 92 at ¶16. The plaintiff states that he filed the latter grievance after transferring to MCC Chicago once he discovered that the other grievances had been removed from his property when he arrived there. Id. at ¶14. The plaintiff avers that the KCDC staff disposed of his grievances, claiming they'd never received them. Id. at ¶13.

## III. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.  Discussion

1.  *Exhaustion of Administrative Remedies*

Butler contends that the plaintiff failed to exhaust his administrative remedies; Nurse Swenson joins that argument. Dkt. Nos. 84 at 3; 79 at 4.

The Prison Litigation Reform Act requires that, prior to filing a lawsuit complaining about prison conditions, a prisoner must exhaust "such administrative remedies as are available[.]" 42 U.S.C. §1997e(a). To do so, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require," and he must do so precisely in accordance with those rules; substantial compliance does not satisfy the PLRA. Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002); Smith v. Zachary, 255 F.3d 446, 452 (7th Cir. 2001). The two primary purposes of this exhaustion requirement are limiting frivolous lawsuits and permitting correctional facilities to address issues prior to litigation, hopefully obviating the need for a lawsuit. Witzke v. Femal, 376 F.3d 744, 753 (7th Cir. 2004).

Failure to exhaust administrative remedies is an affirmative defense to be proven by defendants. <u>Westefer v. Snyder</u>, 422 F.3d 570, 577 (7th Cir. 2005).

Butler and the plaintiff dispute whether the plaintiff filed a grievance related to the issues he raises in this case. According to Butler, the plaintiff did not file any grievance related to his claims. According to the plaintiff, he filed three grievances regarding his medication management while at KCDC and one while he was at another facility, but he never received a response. Dkt. No. 90 at 7. He also states that staff removed grievances from his property. <u>Id.</u> The plaintiff states that his claim should proceed because he did exhaust, despite KCDC's misconduct and failure to respond. Dkt. No. 86 at 6.

In her reply brief, Butler contends that there is no genuine dispute of fact as to the plaintiff's failure to exhaust administrative remedies because he has provided no documentary evidence to support his assertion that he filed grievances. Dkt. No. 101 at 4. The plaintiff has asserted, however, that the grievances were removed from his property, so he would not have had the grievances to submit. Butler also contends that the statements the plaintiff made in his declaration do not create a genuine dispute of material fact as to whether he exhausted his administrative remedies relative to his specific allegations against Butler. Dkt. No. 101 at 4. The court disagrees; the plaintiff made his declaration under penalty of perjury and under 28 U.S.C. §1746. The plaintiff's declaration is sufficient to create a factual dispute regarding whether the plaintiff filed any grievances related to his medical care claims.

Under ordinary circumstances, when a defendant disputes exhaustion, the court should hold an evidentiary hearing before considering the merits of the plaintiff's claims. See Pavey v. Conley, 544 F.3d 739, 742 (7th Cir. 2008) (holding that prisoner not entitled to a jury trial on contested issues regarding his failure to exhaust; instead, a hearing before the district court suffices to resolve any such questions); see also Wagoner v. Lemmon, 778 F.3d 586, 588 (7th Cir. 2015) ("A proper Pavey hearing should be conducted *before* an adjudication on the merits."). The Court of Appeals for the Seventh Circuit has instructed that "in the ordinary case discovery with respect to the merits should be deferred until the issue of exhaustion is resolved. If merits discovery is allowed to begin before that resolution, the statutory goal of sparing federal courts the burden of prisoner litigation until and unless the prisoner has exhausted his administrative remedies will not be achieved." Pavey, 544 F.3d at 742.

In this case, however, neither Butler nor the other defendants asked for summary judgment on the exhaustion issue prior to the discovery deadline. Butler could have asked the court to suspend the discovery deadline and to consider the exhaustion issue before the parties conducted discovery on the merits of the case. Defendants have made similar requests in other cases, and the court has granted those requests. Instead, Butler waited to raise the exhaustion issue until after all the parties had conducted discovery on the merits of the plaintiff's claims. To ignore the parties' arguments on the merits in favor of holding an evidentiary hearing on the question of whether the

plaintiff exhausted his administrative remedies would be wasteful and inefficient. The court will deny Butler's motion for summary judgment to the extent that it seeks summary judgment on exhaustion grounds, and will consider the defendants' motions for summary judgment on the merits. See Wagoner, 778 F.3d at 590-92 (while "it is a better practice to hold a Pavey hearing separate from and before considering a motion for summary judgment," district court did not abuse discretion when it considered fully briefed summary judgment motion instead of holding Pavey hearing).

> 2. *Applicable Law*
>
> a.  Pretrial detainee/convicted prisoner

The plaintiff states that he was a convicted prisoner during the relevant period (May 12, 2015 through about April 4, 2017). Dkt. No. 90 at 2. According to the plaintiff, he was a federal inmate because he was under the jurisdiction and custody of the U.S. Marshal even upon arrest and placement in KCDC. Dkt. No. 86 at 3. The defendants filed supplemental briefs in support of their motions for summary judgment in which they state that the plaintiff was or may have been a pretrial detainee before January 11, 2017. Dkt. Nos. 79 at 2; 81 at 1; 84 at 1-2.

The court takes judicial notice that on May 11, 2015, the defendant was charged in a complaint issued by the U.S. Attorney for the Eastern District of Wisconsin in United States v. Haynie, Case 15-cv-117, dkt. no. 1, the defendant appeared before the magistrate judge on May 12, 2015, dkt. no. 47,

and was ordered temporarily detained[3], dkt. no. 50, the defendant was indicted

on June 9, 2015, dkt. no. 115, the defendant signed a plea agreement on

December 14, 2016, dkt. no. 511, and the court accepted his guilty plea on

January 11, 2017, dkt. no. 539. The plaintiff was a pretrial detainee from May

12, 2015 through January 11, 2017; he was a convicted prisoner starting

January 11, 2017.

"[M]edical-care claims brought by pretrial detainees under the

Fourteenth Amendment are subject only to the objective unreasonableness

inquiry identified in *Kingsley* [v. Hendrickson, ___ U.S. ___, 135 S. Ct. 2466

(2015)]." Miranda v. Cty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018). The

Kingsley Court held that a pretrial detainee alleging an excessive force claim

"did not need to prove that the defendant was *subjectively* aware" that the

amount of force he was using was unreasonable, and needed "only to show

that the defendant's conduct was *objectively* unreasonable." Id. at 351 (citing

Kingsley, 135 S. Ct. at 2472-73). Because the plaintiff was a pretrial detainee

prior to January 11, 2017, the court will apply the objective standard to the

claims that arose before January 11, 2017.

> b.    Standards for evaluating medical-care claims

To establish that the standard of medical care he received violated the

Fourteenth Amendment, a pretrial detainee must show (1) that he suffered

from an objectively serious medical condition, see Greeno v. Daley, 414 F.3d

---

[3] There is no federal pretrial holding facility in Wisconsin. The U.S. Marshal Service contracts with local jails, such as KCDC, to hold detained defendants pending trial.

645, 653 (7th Cir. 2005), and (2) that jail personnel "purposefully, knowingly, or perhaps even recklessly" disregarded a serious risk to his health or safety when treating the condition, <u>Miranda</u>, 900 F.3d at 353-54. Negligence or even gross negligence is not enough. <u>Id.</u> Instead, a defendant's conduct must be objectively unreasonable, which means that the conduct must be "more than negligence . . . something akin to reckless disregard[.]" <u>Id.</u>

After January 11, 2017, the plaintiff was a convicted prisoner, which means that the Eighth Amendment's deliberate indifference standard applies to the events that took place after that date. <u>Miranda</u>, 900 F.3d at 350 (citing <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976)). "The Eighth Amendment's proscription against 'unnecessary and wanton infliction of pain' is violated when prison officials demonstrate 'deliberate indifference to serious medical needs' of prisoners—whether the indifference 'is manifested by prison doctors in response to prison needs or by prison guards in intentionally denying or delaying access to medical care.'" <u>Lewis v. McLean</u>, 864 F.3d 556, 562 (7th Cir. 2017) (quoting <u>Estelle</u>, 429 U.S. at 104). A deliberate indifference claim contains both an objective and a subjective component. "[A] prisoner must first establish that his medical condition is 'objectively, sufficiently serious,' and second, that prison officials acted with a 'sufficiently culpable state of mind'— i.e., that they both knew of and disregarded an excessive risk to inmate health." <u>Id.</u> at 562-63 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)). "To determine if a prison official acted with deliberate indifference, [courts] look into his or her subjective state of mind." <u>Petties v. Carter</u>, 836 F.3d 722, 728

(7th Cir. 2016) (citing <u>Vance v. Peters</u>, 97 F.3d 987, 992 (7th Cir. 1996)). "[S]howing negligence is not enough." <u>Id.</u> (citing <u>Estelle,</u> 429 U.S. at 106). "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." <u>Id.</u> (citing <u>Farmer</u>, 511 U.S. at 836-38). "[A] plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." <u>Id.</u> (citing <u>Farmer</u>, 511 U.S. at 837).

Both standards require courts to determine whether the plaintiff had an objectively serious medical need. "Objectively serious medical needs are those that have either been diagnosed by a physician and demand treatment, or are 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" <u>Cesal v. Moats</u>, 851 F.3d 714, 721 (7th Cir. 2017) (quoting <u>Estelle</u>, 429 U.S. at 104-105). "Hypertension is a serious condition. Untreated it can result in strokes or heart attacks." <u>Jackson v. Pollion</u>, 733 F.3d 786, 789 (7th Cir. 2013). The defendants have not argued that the plaintiff's hypertension and high blood pressure were not objectively serious medical needs, and the court finds that they were. The only question for summary judgment is whether the defendants either "purposefully, knowingly, or perhaps even recklessly" disregarded the plaintiff's condition before January 11, 2017, or that they knew of and disregarded that condition after January 11, 2017.

c.     Application of the standards

i.     **May 12, 2015 through January 11, 2017: Fourteenth Amendment Standard Applies**

Swenson and Butler contend that the care they provided the plaintiff met the Fourteenth Amendment's objectively reasonable standard. Dkt. Nos. 79 at 4; 84 at 2.

The plaintiff disagrees, arguing that Swenson acted with deliberate indifference because she did not order hypertension medication for him when he arrived at KCDC, or in the months that followed.[4] Dkt. No. 86 at 3. He states that her initial excuse for not ordering the medication was that KCDC could not afford to supply him with such an expensive medication, given that his blood pressure was normal. Id. at 4. The plaintiff argues that his normal blood pressure did not justify Swenson and Butler's decision not to prescribe him his medication and not to try to obtain his records. Id. The plaintiff contends that Butler "was deliberately indifferent to his Hypertension medical needs by failing to provide him his hypertension medication for high blood pressure for 20 months, exacerbating his injury and unnecessarily prolonging his serious health issues." Dkt. No. 90 at 4. According to the plaintiff, Butler told him he was fine without his hypertension medication but discovered later that his hypertension was out of control because of Butler's decision not to prescribe his medication. Id. at 5.

---

[4] The plaintiff applies the Eighth Amendment's subjective deliberate indifference standard throughout his summary judgment filings.

Even if the plaintiff is right that Butler did not prescribe medication for him when he arrived at KCDC because of the cost, he has not shown that Butler "purposefully, knowingly, or perhaps even recklessly" disregarded his condition. The record shows that when the plaintiff arrived at KCDC, his blood pressure was normal. But given the plaintiff's history of hypertension, Butler ordered additional blood pressures and pulse rates. Ordering additional blood pressure tests was not disregard; it was action. The plaintiff tested normal on May 13, 14, 16 and 18, 2015. Swenson ordered another blood test a month later; the results of that June 18, 2015 test also were normal. Based on these repeated normal test results, Butler did not believe it was medically necessary to prescribe the plaintiff hypertension medication. She was not disregarding the plaintiff's condition; she (and Swenson) were choosing not to give him medication because the condition was under control. Butler stopped working at KCDC on April 15, 2016. The plaintiff did not file any HSRs until after his January 12, 2017 physical examination—nine months later. The record does not contain any evidence that Butler had reason to believe that the plaintiff needed medication. She made sure he was checked and monitored, and his pressure did not spike while Butler was at KCDC. No reasonable jury could find that Butler purposefully, knowingly or recklessly disregarded the plaintiff's hypertension in declining to prescribe medication to him between May 2015 and April 2016. The court will grant Butler's motion for summary judgment.

The plaintiff asserts that Swenson's alleged "initial excuse" for not ordering hypertension medications was the cost, and he reiterates that his

normal blood pressure did not justify the failure to order the medications. Dkt. No. 88 at ¶6. Swenson denies telling the plaintiff that hypertension medications were very expensive and that KCDC couldn't afford them. Dkt. No. 104 at ¶6. Even if she did say that, however, it would be irrelevant; the plaintiff has not shown that Swenson disregarded his condition. On May 18, 2015 she ordered that the plaintiff have another pressure and pulse check in a month. The results of that June 2015 check were normal. The plaintiff did not complain of problems between that date and January 2017. While the plaintiff does not agree with Swenson's (and Butler's) decision to not order hypertension medications for him in 2015 and 2016, he does not dispute that the reason they didn't order them was because the plaintiff had repeated normal blood pressure readings. The plaintiff has not submitted any evidence demonstrating that their decision was objectively unreasonable. The court will grant Swenson's motion for summary judgment as it relates to the plaintiff's care before January 11, 2017.

   ii. **January 12, 2017 through April 3 or 4, 2017: Eighth Amendment Standard Applies**

  Swenson contends that she did not act with deliberate indifference regarding the care and treatment of the plaintiff from January 2017 until his discharge from KCDC. Dkt. No. 73 at 7. Durrani asserts that he was not deliberately indifferent to the plaintiff's condition. Dkt. No. 60 at 2.

  The plaintiff maintains that Swenson deliberately supplied him with the wrong medication, which he says is evident from his "abnormal high blood pressures: 170/120, 197/127, 148/103, 133/92, 154/104 and 161/104." Dkt.

23

No. 86 at 5. The plaintiff argues that Durrani "was deliberately indifferent to Plaintiff's serious medical needs by not prescribing him his legal medication (Lisinopril and Hydrochlorothiazide) until 20 months later, and then prescribing him the wrong medications (Metroprolol, Spironolactone and Clonidine)." Dkt. No. 95 at 2. He states that Durrani should have provided him Lisinopril and Hydrochlorotiazide from January to April 4, 2017. Id. at 2-3.

At the plaintiff's physical on January 12, 2017, his blood pressure was high. That same day, Swenson ordered Clonidine, Lisinopril 20, Hydrochlorothiazide and Metoprolol; she also ordered that the plaintiff's pressure and pulse be taken daily until his blood pressure fell below 140/90. Finally, she ordered lab tests in two to three weeks, or sooner. The next day, she ordered his pressure to be checked three times. On January 16, Swenson adjusted the plaintiff's medications, ordered daily pressure tests with a cuff and ordered that the Marshal be contacted to approve lab tests. The lab tests were performed on January 17, and Swenson reviewed them the next day. On January 23 and 25, Swenson again adjusted the plaintiff's medication, based on results of blood pressure tests. On February 4, the plaintiff reported the strange feeling in his chest and his light-headedness. The plaintiff had his pressure checked the next day, at which time he said he didn't need to go to sick call. The staff encouraged him to contact the Health Services Unit if he needed help. Five days later, on February 9, Swenson adjusted the plaintiff's medication, drafted his six-page history and treatment plan and discussed the possibility of statins with him.

No reasonable jury could conclude from this evidence that Swenson knew of, but disregarded, the risk presented by the plaintiff's hypertension after January 12, 2017. She began treatment the same day the plaintiff had the elevated reading, and she continued monitoring and treatment over the next two months. The real kernel of the plaintiff's claim is not that Swenson didn't do anything to treat his hypertension. It is that he disagrees about what Swenson did—in particular, he disagrees with the medication she ordered for him. But "the Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment, such as disagreement over whether one course of treatment is preferable to another." Cesal, 851 F.3d at 721 (citing Snipes v. DeTella, 95 F.3d 586, 591 (7th Cir. 1996)). Even if Swenson was the one who chose the medications, and even if there was evidence that she was negligent, or committed malpractice, in choosing to do so—and there is no evidence of that—"[d]eliberate indifference is not medical malpractice . . . ." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008). The plaintiff has not raised a genuine issue of material fact as to whether Swenson was deliberately indifferent to his objectively serious medical need, and the court will grant summary judgment in favor of Swenson.

Durrani is the one who actually prescribed the medications, and the plaintiff does not dispute that the three medications he challenges—Metoprolol (a beta blocker), Spironolactone (a high blood pressure and heart medication), and Clonidine (a hypertension medication)—are listed in the Physician's Desk Reference as approved medications for treating hypertension. The plaintiff

believes that he should have been prescribed only Lisinopril and Hydrochlorothiazide, the medications he'd taken for years without trouble. In other words, he disagrees with Durrani's choice of treatment. But "a mere disagreement with a doctor's medical judgment" does not amount to deliberate indifference. <u>Greeno</u>, 414 F.3d at 653 (citing <u>Estelle</u>, 429 U.S. at 106). Durrani did not disregard the plaintiff's condition; he prescribed medication for it. A reasonable jury could not conclude that Durrani was deliberately indifferent to the plaintiff's serious medical condition. The court will grant Durrani's motion for summary judgment.

## IV. Conclusion

The court **GRANTS** defendant Durrani's motion for summary judgment. Dkt. No. 57.

The court **GRANTS** defendant Butler's motion for summary judgment. Dkt. No. 64.

The court **GRANTS** defendant Swenson's motion for summary judgment. Dkt. No. 71.

The court **ORDERS** that this case is dismissed and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30** days of the entry of judgment. <u>See</u> Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or

excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28** days of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 23rd day of September, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**